OPINION OF THE COURT
Michael R. Juviler, J.
This is a written version of a decision that was announced orally from the Bench after a hearing on a motion to suppress a gun. A police officer had arrested the defendant for murder, and in trying to start the defendant’s stalled car and take it to the Precinct, the officer found the gun under the hood of the car. Ballistics tests established that the gun was the murder weapon. The defendant has been indicted for murder and related crimes.
The burden is on the People to go forward with evidence showing the reasonableness of the seizure of the gun. Then it becomes the defendant’s burden to prove the unreasonableness of the seizure. The defense contends that the police officer’s testimony was incredible, and that even if the officer’s testimony were true, he lacked probable cause to look under the hood of the car, and should have called for a tow truck instead.
Having reviewed the evidence and determined issues of credibility, I make the following findings of fact.
Shortly after midnight on January 2, 1992, on a street in the 77th Precinct in Brooklyn, a group of men approached Tawana Alexander and three young men near her and opened fire on the men.
Alexander was fatally wounded in the head, and the three men, Jamel Banks, Michael Dunlap, and David Perdue, were less seriously injured.
At 6:00 that morning, a detective interviewed one of the victims, Jamel Banks, at the 77th Precinct. Banks said that "Kareem”, whom he knew, was one of the shooters. Upon looking at 200 mug shots he picked out a photograph of Kareem Berry, the defendant, as the Kareem who had shot at him. The police then had probable cause to arrest the defendant.
A "wanted” photograph of the defendant was posted in the 73rd Precinct, which adjoins the 77th. Police Officer John Brill of the 73rd Precinct saw it and recognized Kareem Berry, whom he knew by his full name. During the previous two years, Officer Brill had spoken to Berry many times near a *204 building in his Precinct known to the officer as a busy source of drugs.
At 9:10 on the night of January 27, 3Vi weeks after Banks’ photographic identification, while Police Officer Brill was on motor patrol in the 73rd Precinct with his supervising sergeant, he saw the defendant driving a blue Chevrolet toward Officer Brill’s patrol car. Brill immediately recognized the defendant as the man wanted for homicide. The defendant made a turn and stopped his car, while Officer Brill drove around to join him. By then, the defendant had left his car and stood nearby. The two police officers lawfully arrested the defendant. A struggle followed, during which Officer Brill radioed for other officers. The arrest was completed, the defendant handcuffed. Neither the defendant’s conduct nor the condition of the Chevrolet that night had yet provided Officer Brill with any additional evidence of crime.
Officer Brill then took the car keys from the defendant’s pocket. He asked the defendant whether he had papers for the car, the defendant said no. Brill asked whose car it was. The defendant said that it was his. Officer Brill decided to take the car to the Precinct to determine who owned it and safeguard it until the ownership could be verified.
The other officers arrived in a separate police car. They took the defendant to the Precinct in their car, while Officer Brill entered the Chevrolet and tried to start it, using the keys obtained from the defendant.
There was a problem starting the car. Officer Brill pulled on the inside latch to open the hood, got out of the car, manipulated the outside latch, and lifted up the hood. Brill’s purpose was to see whether he could start the car, as he had done in similar situations. Because it was dark, he used his flashlight to examine the engine and the battery. As he shone his flashlight toward the battery, he saw a gun between the battery and the fender; the gun’s grip faced up and its barrel was below the grip, pointing toward the passenger compartment. The sergeant removed the gun.
Officer Brill fumbled with the battery cables and got the car started. He drove it to the Precinct.
On these facts, the "relevant inquiry * * * is whether or not [Officer Brill] had a right to be in the position from which he made his observation” of the gun. (See, People v Shapiro, 141 AD2d 577, 578; see also, People v Spinelli, 35 NY2d 77.) If he had a right to be where he was and to make his observa *205 tians of the engine compartment of the car, he was permitted to use the flashlight, since that compartment would have been visible in daylight from his vantage point; the gun would be considered in plain view and subject to lawful seizure. (People v Rudasil, 43 NY2d 789.)
There appears to be no case on point on whether Officer Brill had the right to look in the engine compartment. Nevertheless, settled principles of the law of search and seizure regarding automobiles support the lawfulness of his conduct.
An officer is authorized to arrest a person for driving a car without ownership papers and upon that arrest may impound the car and drive it to the Precinct to protect it while the ownership can be checked out; an officer may also take a car to the Precinct after arresting the driver for an offense not related to the car. (People v Gonzalez, 62 NY2d 386; People v Galak, 80 NY2d 715.)
Because it was lawful to take the car to the police station, it was reasonable to open the hood to get it started. True, this was a "search” in the meaning of the Fourth Amendment of the US Constitution: the police officer was looking for something in closed private property and moving privately owned property to get a look (see, Arizona v Hicks, 480 US 321, 323-324); and, there was "an intrusion into an area where an individual has a reasonable expectation of privacy” (see, People v Dunn, 77 NY2d 19, 25), particularly as the hood was latched from the inside of the car.
But this search was not "unreasonable”. In People v Galak (supra), the Court of Appeals noted that "the language of the Fourth Amendment * * * protects citizens not from all searches by governmental actors but only from those that are ‘unreasonable’. In its modern Fourth Amendment jurisprudence, the Supreme Court has held that the reasonableness of a search is calculated by weighing the governmental and societal interests advanced by the search against the individual’s right to be free from arbitrary interference by law enforcement officers (United States v Brignoni-Ponce, 422 US 873, 878; see also * * * Colorado v Bertine, 479 US 367, 372 * * *)” (80 NY2d, at 718.)
One of the "interests” advanced by a permissible search of an automobile is "protecting an owner’s property while it is in the custody of the police.” (People v Galak, 80 NY2d, at 718, supra.) That interest justifies even a search of a closed compartment in the passenger portion of the vehicle, or of a *206 closed package in the car, if it is done according to established procedures for inventory searches. (See, People v Gonzalez, 62 NY2d 386, supra.) In this case, there was no inventory search in the engine compartment, no search of property like an inventory search, but the Galak principles uphold the search. Brill searched the engine compartment to determine why the car would not start. The ultimate purpose of his search was to remove the car from the street at night to protect it for the owner, whoever that owner might be; protecting an owner’s property is also a purpose of a lawful inventory search. (See, People v Galak, supra.)
The reasonableness of Officer Brill’s search for the cause of the car’s failure to start is apparent. He had just seen the defendant operating the car, so it was reasonable to believe that if he opened the hood he probably could start the car quickly, just as he had done in other cases. But "probable cause” was not necessary — just as it is not necessary for an inventory search — because this was not a search for incriminating evidence or contraband.
A tow truck was an alternative, but an alternative to police action does not preclude the reasonableness of the action taken, even if that action involves the search of a portion of an automobile. (Colorado v Bertine, 479 US 367, 373-374, supra.) The Fourth Amendment did not require the officer to wait indefinitely at night for a tow truck without trying to start the car. The officer’s actions appropriately allowed him promptly to return to the Precinct, where his prisoner would be waiting, and not delay the processing of the arrest.
Another principle of search and seizure is that automobiles involve less expectation of privacy in their contents than homes or offices. That is one of the reasons why automobiles are exempt from the requirement of a search warrant. (See, People v Belton, 55 NY2d 49, 53-55; see also, People v Branigan, 67 NY2d 860, 862.) And, the intrusion into privacy by looking in the engine compartment — a place commonly examined by gas station attendants, mechanics, and other strangers —was far more limited than the intrusion during a police inventory search of a glove compartment, where private papers can be kept, or of a briefcase in the passenger compartment. Therefore, the requirement of specific established police procedures which obtains for inventory searches should not be applicable on these facts.
In People v Branigan (supra), police officers saw the defen *207 dont committing traffic violations, so they stopped the car and asked for his papers. The defendant said that the car was not his and that he had no license. He looked through papers scattered on the front seat, apparently trying to find the documents, and mumbled to his passenger. The officers ordered the defendant out of the car for reasons of safety and asked him where the papers were. He answered "there” and pointed to the front seat. An officer entered the car looking for documents. The seat and floor were strewn with papers. The officer looked through some papers and saw the butt of a gun. The Court found that the officer’s conduct was reasonable "in light of the diminished expectation of privacy with respect to the contents of automobiles.” (Supra, at 862.) There was less intrusion into privacy in this case.
In People v Shapiro (141 AD2d 577, supra), after police officers lawfully stopped the defendant at night for a traffic violation and arrested him for driving while impaired by drugs, he got out of his car, then asked to return to the car to turn off the lights and close the door. The key was still in the ignition, so the officers refused. When an officer entered the car to turn off the lights, he saw drugs inside. The Appellate Division found the entry into the car an appropriate safety measure, preferable to allowing the drug-impaired defendant to return to the car from which the ignition key had not been removed. Here, as in Shapiro, the police officer undertook a small intrusion into privacy for the proper purpose of getting a car safely to the Precinct. Since opening the hood for that purpose was reasonable, the discovery and seizure of the gun were lawful, and the motion to suppress the gun is denied.